IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT DEJOHNETTE, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13 C 1787 |
| v. | ) | |
| | ) | Magistrate Judge |
| CAROLYN W. COLVIN, Acting | ) | Maria Valdez |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Robert DeJohnette claim for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, DeJohnette's Motion to Reverse the Decision of the Commissioner of Social Security is granted in part and denied in part, and the Commissioner's motion for summary judgment [Doc. No. 34] is denied.

## BACKGROUND

### I. PROCEDURAL HISTORY

On January 7, 2010, Robert DeJohnette, III filed a claim for Disability Insurance Benefits alleging disability beginning October 15, 2008. The claim was denied initially and upon reconsideration, after which Dejohnette timely requested

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).

a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on September 22, 2011. DeJohnette, who was represented by counsel, personally appeared and testified at the hearing. Vocational expert ("VE") Dr. Jeffrey Lucas also testified. The ALJ denied DeJohnette's claim for Disability Insurance Benefits on October 18, 2011, finding that Dejohnette was not disabled under the Social Security Act. The Social Security Administration Appeals Council then denied DeJohnette's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.  FACTUAL BACKGROUND[2]

### A.  Background

DeJohnette was born on June 20, 1969 and was 42 years old at the time of the ALJ hearing. DeJohnette's alleged disability arises from a motorcycle accident on March 25, 2007, during which he suffered a traumatic brain injury; fractures of his vertebrae, ribs, and femur; and injuries to his legs and feet.

### B.  Medical Evidence

After his accident, DeJohnette was treated with extensive surgery and was later transferred to a rehabilitation hospital, where he underwent treatment for approximately one and one-half months. After his release from the rehabilitation hospital, DeJohnette was seen for numerous follow-up visits by Dr. Mark H. Applebaum. In March of 2008, Dr. Applebaum diagnosed DeJohnette with a gait dysfunction, mild right shoulder weakness, and mild neuropathic shoulder pain, as

---

[2]  The following facts from the parties' briefs are undisputed unless otherwise noted.

well as a right foot drop due to nerve injury. Applebaum recommended a course of physical therapy as well as the pain medication Norco, and also recommended that DeJohnette wear an "air boot."

At a follow-up appointment in September 2008, DeJohnette stated that he was working 4-5 hours per day at a new job doing "indoor computer work with only occasional light lifting, mostly from waist level." (R. 252.) He reported continuing pain in his right shoulder and back, as well as in his right knee and left leg, which seemed to be influenced by weather. DeJohnette did not report using any pain medication. (R. 252.) In February 2009, DeJohnette again complained to Dr. Applebaum of "moder[ate] intermittent discomfort in his back," right shoulder and lower extremities. (R. 250.) Dr. Applebaum concluded that DeJohnette's condition had "plateaued." (R. 250). He also noted that DeJohnette "[did] not feel the need for analgesics and [did] not want any," and that DeJohnette was "independent in all A[ctivities of ]D[aily ]L[iving]s and mobility." (R. 250.)

DeJohnette visited Dr. Applebaum again in June 2008. At this appointment, DeJohnette reported that he had begun to experience right ankle pain—which occurred when standing or walking and persisted when he was off his feet—two months previously. (R. 248.) Dr. Applebaum noted that DeJohnette "still [had] a foot drop and some numbness," but reported no other new symptoms. (R. 248.) DeJohnette also reported that he had "been ambulating without his AFO," that he was not using medications, and that he had been using a cane. *Id.*

Finally, in September 2009, DeJohnette complained of "some L knee pain that [had] been going on for a long time," and which he noticed mostly when walking. (R. 242.) He also reported pain in his right shoulder, legs, and right ankle, as well as some numbness in his right ankle. Dr. Applebaum ordered that DeJohnette undergo physical therapy for his left knee pain, and suggested that he obtain a "small lift" in his shoe. (R. 244.)

In March 2010, Dr. Mahesh Shah performed a consultative examination of DeJohnette for the Bureau of Disability Determination Services. Dr. Shah determined that DeJohnette was obese, walked with a limp, and could not walk 50 feet without the use of a cane. DeJohnette was able to get on and off the examining table and from a sitting to a supine position without difficulty. He also noted that DeJohnette had mild tenderness in the lumbar region. DeJohnette had limited flexion and extension in his right knee, and his straight-leg raise was 60 degrees on the right, 70 degrees on the left, and that he walked with a "high-stepping gate." (R. 262.) Dr. Shah also noted that DeJohnette had 3/5 strength in his right lower extremity, a right foot drop, and no dorsoflexion of his right ankle. X-rays of DeJohnette's lumbar spine led Dr. Shah to diagnose DeJohnette with degenerative disc disease at the L5-S1 levels, (R. 265), and Dr. Shah also noted mild tenderness in the lumbar region of DeJohnette's back. (R. 262.)

In April 2012, Dr. Vidya Madala prepared a physical residual functional capacity ("RFC") assessment based on a review of DeJohnette's medical records. Dr. Madala concluded that DeJohnette could occasionally lift 20 pounds, frequently lift

10 pounds, stand or walk for two hours in an eight-hour work day, and sit for six hours in an eight-hour work day. (R. 268.)

### C. Plaintiff's Testimony

At the hearing, DeJohnette testified that he had received a GED and an associate's degree in applied science. He had previously worked for a steel company, and later for a printing company as a driver and shipping clerk, where he sometimes was required to lift over 50 pounds. (R. 47-48.) After the accident, however, DeJohnette was unable to drive a forklift or use a hand jack, and was not able to keep up with the pace of work because of his pain. He subsequently obtained a different, part-time job for "a couple of months." (R. 45.) At this job, DeJohnette was not required to lift. However, DeJohnette stated that he had been unable to sit or stand for long periods of time because of his pain, and therefore he had been forced to quit the job. (R. 47.)

With respect to his current pain, DeJohnette testified that the pain rendered him unable to "really bend" or to "stand for long periods of time or sit," (R. 48), and that his back and legs would stiffen up when he sat for long periods of time. (R. 49.) DeJohnette described the pain he experienced, on a one-to-ten scale, as "[b]asically about a nine to a ten," (R. 56.) and testified that he experienced this pain "[p]retty much 24 hours a day." (R. 60.) Because of his pain, DeJohnette had not considered seeking a job requiring only sedentary work. (R. 58-59.) DeJohnette stated that he did not take pain medication because it made him sick: hydrocodone had upset his

stomach, and that he believed that the medication was damaging his stomach and so had stopped taking it. (R. 52.)

With respect to his physical abilities, DeJohnette testified that it was difficult for him to lift anything "really heavy," and that he was unable to perform "repetitive type work." (R. 49.) DeJohnette testified that he could walk a block with the aid of an "AFO boot," but that he needed to wear the boot because he had a "drop foot." (R. 49.) He testified that, he could lift a gallon of milk with his left hand but, while "it may [have] be[en] possible" to do so with his right hand, he "couldn't sit and hold it." (R. 49.) He was not able to bend without pain, and was not able to stoop because of the limitations in his legs. (R. 50.) Although he did not have a cane at the hearing, DeJohnette specified that he used a cane "every now and then . . . when I'm a little sore, like when it's raining or cold." (R. 54.) DeJohnette stated that he could climb stairs, but if "there's more than probably five, I have a problem with that." (R. 49.) DeJohnette lived at home with his mother, and was able to climb the six or seven steps to reach the apartment. (R. 50-51.)

With respect to his activities of daily living, DeJohnette stated that he took public transportation "sometimes." (R. 51.) There was a store "about four doors down" from DeJohnette's apartment, and he was able to walk to the store. (R. 51.) He also stated that he didn't help with chores at home because he was prevented from doing so by pain. (R. 51.) DeJohnette did not really attempt to perform chores because "trying to lift stuff with my right hand, by my being right handed, I could easily drop something or, you know, just, it just wasn't functional because I actually

slipped one time in the tub and bruised my side real bad so it's like I don't really try a lot of things." (R. 58.)

D.    **Vocational Expert Testimony**

Vocational Expert ("VE") Dr. Jeffrey Lucas first clarified that, in his previous work, DeJohnette's tasks included shipping and receiving, forklift driving, and delivery, sometimes requiring lifting over 50 pounds. (R. 60.) Dr. Lucas concluded that DeJohnette had experience as a shipping and receiving clerk, with a specific vocational preparation (SVP) level of five; an industrial truck driver, with an SVP level of three; and a bindery operator worker, with an SVP level of three. (R. 61-62.)

The ALJ then questioned the VE about a hypothetical person with the same age, education, and work experience as DeJohnette. Adopting the Dr. Madala's evaluation, the ALJ assigned the hypothetical person a residual functional capacity ("RFC") limiting him to light work with the ability to stand or walk "with normal work breaks" for two hours in an eight hour day; the ability to sit with normal work breaks for six hours of an eight hour day. The individual could only perform work that did not require the need to balance, crouch, or climb ladders, ropes or scaffolds, and that required no more than occasional crawling, kneeling, stopping, and climbing of stairs or ramps. (R. 62.) The ALJ also specified that the work could not involve exposure to extreme cold or hazards such as machinery or heights. *Id.*

The VE stated that the hypothetical person would not be able to perform any of DeJohnette's past work. *Id.* When the ALJ asked the VE if "there would be any acquired work skills or semi-skills that would be transferred to other jobs," (R. 63.)

the VE—without naming any specific skills—noted that "[t]hey would be transferable to a service dispatcher . . . telephone info clerk . . . [a]nd order clerk." *Id.* The VE stated that for service dispatcher, there were 136 jobs regionally and 3,304 jobs nationally; for telephone clerk, there were 223 jobs regionally and 5,464 jobs nationally; and for order clerk, there were 1,449 jobs regionally and 36,598 jobs nationally. *Id.* The ALJ asked if the assessment would change if the hypothetical person "needed to use an assistive device," and the VE stated that it would not. *Id.*

Finally, the ALJ asked the VE if the hypothetical person could perform any other work if the ALJ fully credited DeJohnette's testimony. The VE stated that constant pain of a nine or ten is "equivalent to getting burned and needing to go to the emergency room at all times," which would preclude employment. *Id.*

DeJohnette's attorney then asked if the hypothetical person could perform any work if he was further limited to "less than occasional handling, fingering, feeling, reaching in all directions." (R. 65.) The VE stated that he could perform the position of surveillance monitor, an unskilled position. *Id.* The VE specified that there were 1,073 such jobs in the Chicago region and 33,088 jobs nationally. (R. 67.)

DeJohnette's attorney also asked the ALJ about "normal work breaks allowed in competitive work." (R. 66.) The ALJ stated that a 15 minute break in the morning and afternoon, plus a 30-minute lunch break was normal, with coffee and bathroom breaks allowed "pretty much as needed." (R. 66.) When asked about the percentage of on-task time required by an average job, the VE stated "85 to 95 percent, with 90 being the average." *Id.* The attorney then asked the VE if the work the hypothetical

individual could perform would change "if there is a need to change positions at will or a need to lay down?" *Id.* The VE replied that needing to lay down would be acceptable on breaks and on lunch, but that otherwise it would preclude employment. *Id.*

E. **ALJ Decision**

The ALJ analyzed DeJohnette's application using the five-step procedure for determining disability under the Social Security regulations. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found that DeJohnette had not engaged in substantial gainful activity since his onset date of October 15, 2008. At step two, the ALJ concluded that DeJohnette had severe impairments arising from his motorcycle accident, as well as severe obesity. At step three, the ALJ examined the Listings contained at 20 C.F.R. pt. 404, subpt. P, App. 1—including section 1.02, major dysfunction of a joint(s), among others[3]—and concluded that DeJohnette's impairments, alone or in combination, did not meet or medically equal a Listing.

The ALJ then determined that DeJohnette retained the residual functional capacity ("RFC") to perform sedentary work and light work, provided that the light work allowed the use of an assistive device, required no more than occasional stooping, kneeling, crawling, or climbing of ramps or stairs, did not require balancing, crouching, climbing ladders, ropes, or scaffolds, and did not require exposure to extreme cold or hazards. In doing so, the ALJ determined that DeJohnette's testimony was not fully credible. He concluded that, although he

---

[3] The ALJ also examined 1.03 and 1.04; DeJohnette does not challenge the ALJ's findings on these Listings on appeal.

believed DeJohnette experienced some pain, the pain was not completely disabling. Specifically, the ALJ noted that DeJohnette had reported pain to his physicians that was less severe than he claimed at the hearing; had not reported side effects as a reason for ending the use of pain medication; and had not followed up on his referral for physical therapy. The ALJ also found that, while DeJohnette had stated that he did not perform household tasks, the evidence did not establish that he was unable to do so. Finally, the ALJ noted inconsistencies in DeJohnette's testimony, specifically that DeJohnette stated that he could only walk one block, but later "acknowledged having walked four blocks to a store," (R. 32-33), and that—despite his testimony otherwise—DeJohnette had reported to his physician that he left his post-accident job because he was laid off due to "economics." (R. 33.)

At step four, the ALJ concluded that DeJohnette could not perform his past relevant work. At step five, however, the ALJ determined that DeJohnette could perform the jobs of service dispatcher, telephone information clerk, order clerk, and surveillance system monitor, and that these jobs existed in sufficient numbers in the economy. Therefore, the ALJ concluded DeJohnette was not disabled under the Social Security Act.

## **DISCUSSION**

### I.   **ALJ LEGAL STANDARD**

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). To determine whether a claimant is disabled, the ALJ considers five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.   JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is therefore limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that ALJ's decision must be affirmed even if "'reasonable minds could differ'" so long as "the decision is adequately supported") (citation omitted).

In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. "[A]lthough an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence."). Instead, "[t]he ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Moore v. Colvin*, 743 F.3d at 1123; *see also Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . .").

## III. ANALYSIS

In support of his motion, DeJohnette argues that the ALJ erred in determining that he was not disabled at step three of the disability analysis, in assessing his credibility with respect to the effects of his impairments, and in determining his RFC. Although, as will be discussed below, any error in the ALJ's step three analysis or his assessment of DeJohnette's credibility was harmless, the ALJ erred in assessing DeJohnette's RFC, and that error was not harmless. Accordingly, remand is appropriate in this case.

### A.   The ALJ Erred in Assessing DeJohnette's RFC.

DeJohnette claims that, in determining his RFC, the ALJ erred by failing to specifically address evidence from the hearing that DeJohnette was unable to sit for significant periods of time and that he needed to lie down during the day to accommodate his pain. (Pl.'s Mem. at 14). An RFC is the most that a claimant can do despite his limitations, and is "used to determine [a claimant's] ability to engage in various levels of work (sedentary, light, medium, heavy, or very heavy.)." *Clifford*, 227 F.3d at 872 n.7; s*ee* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184.[4] "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling."

---

[4] Interpretive rules, such as Social Security Rulings ("SSR"), do not have force of law but are binding on all components of the Agency.  20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

*Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *see* SSR 96-8p, 1996 WL 374184, at *7.

The evidence that DeJohnette presented on both points was not extensive. With respect to his inability to sit, DeJohnette testified that he had left his post-accident job because the pain had proven incompatible with the demands, as he was not able to "sit for long periods of time or stand for long periods of time." (R. 46-47.) DeJohnette later reiterated that he could not "stand for long periods of time or sit," (R. 48.), and specified that his back and legs would stiffen up when he sat for long periods of time. (R. 49.) With respect to his need to lie down during the day, DeJohnette's testimony was also brief: in response to his attorney's request to describe a "typical day," DeJohnette replied that he "[p]retty much just sat for a little bit, laid down for a little bit, sat, stood up, sat down, lay down a little bit, just, you know . . . ." (R. 57.)

Despite this minimal presentation, however, limitations on DeJohnette's ability to sit and stand and a need to lie down were clearly part of the ALJ's analysis, at least in a hypothetical capacity. After the VE had listed the four jobs which he found DeJohnette able to perform, the ALJ asked the VE whether his answer would change "if there is a need to change positions at will with a need to lie down?" (R. 66.) To this, the VE replied that he thought such an individual "could lay down on his break and on his lunch, but I don't think lying down in a, in the office would be acceptable." *Id.* The VE's testimony established, therefore, that if a hypothetical individual with DeJohnette's characteristics needed to change position

at will or lie down for significant periods during the day—as DeJohnette contended he did—such a limitation would preclude all employment and necessitate a finding of disability.

In his opinion, however, the ALJ did not address DeJohnette's alleged need to change positions during day or his need to lie down during the day in any capacity; it is therefore unclear whether he considered this evidence in determining that DeJohnette was not disabled. An ALJ has a duty to "evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano*, 556 F.3d at 563. "[A]lthough an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore*, 743 F.3d at 1123. Furthermore, an "ALJ may not discredit a claimant's testimony about [his] pain and limitations solely because there is no objective medical evidence supporting it." *Id.* at 562. As DeJonette's testimony was the only specific evidence on these points, the ALJ overlooked a "line of evidence" by failing to determine whether or not these alleged limitations were part of DeJohnette's RFC.

The ALJ's failure to consider these alleged limitations therefore leaves the court unable to evaluate whether the ALJ erred in his analysis, and requires remand: without being sure the ALJ considered and dismissed these alleged limitations, it is impossible to determine whether the ALJ accounted for all of DeJohnette's pertinent limitations in reaching his conclusion, and therefore

whether his reliance on the VE's testimony was sound. *See Phillips v. Astrue*, 601 F. Supp. 2d 1020, 1034 (N.D. Ill. 2009) (remanding where impossible to determine sufficiency of hypothetical question because "the ALJ never adequately resolved the core factual issue of, inter alia, whether Claimant needed to lie down for one hour per day."); *cf. Cuevas v. Barnhart*, No. 02 C 4336, 2004 WL 1588277, at *15 (N.D. Ill. July 14, 2004) (error where ALJ failed to address claimant's testimony that, "during the day, he experiences pain and fatigue, and needs to take one- to two-hour naps two to three times a day" and that "evidence [was] unrebutted in the record."). Although the evidence presented was minimal on these points, the ALJ's failure to explicitly discuss his findings, coupled with his questions to the ALJ, convinces the Court that it cannot fully review the ALJ's determination without clarification.

The Commissioner argues that the ALJ did not err because the ALJ generally discounted DeJohnette's credibility and because the ALJ adopted the opinion of state agency physician, Dr. Madala, which concluded that DeJohnette could stand or walk for at least 2 hours and sit for about 6 hours over the course of an 8-hour day. (Def.'s Mem. at 8.) While the ALJ did not find DeJohnette fully credible, however, neither did he "suggest that the claimant [did] not experience pain, but rather that the medical evidence does not support the extent of the allegations as to severe pain," (R. 32.), which could have encompassed DeJohnette's need to lie down and stand up. And Dr. Madala's report does not detail DeJohnette's claims on this account, so it is unclear if Dr. Madala in fact considered them. Furthermore, while such an analysis might support the Commissioner's conclusion that the alleged

limitations were not part of DeJohnette's RFC, the ALJ did not put forward those arguments, and an agency's lawyers cannot "defend the agency's decision on grounds that the agency itself had not embraced." *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (discussing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)); *see also Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) ("[T]hese are not reasons that appear in the ALJ's opinion, and thus they cannot be used here.").

This is not to say that the ALJ on remand must find that DeJohnette's claims to this extent are credible, and it may very well be that the ALJ on remand does not find that DeJohnette must lie down or sit or stand at periods incompatible with employment. However, because without an explicit discussion of these alleged limitations it is impossible to determine whether the ALJ "evaluate[d] all limitations that arise from medically determinable impairments, even those that are not severe," *Villano*, 556 F.3d at 563, remand is appropriate.

DeJohnette also argues that the ALJ erred when he failed to determine which—if any—of the skills DeJohnette had acquired in his past work were transferable to other work in the national economy. An individual is disabled if, in addition to his previous work, he is unable to "engage in any other kind of substantial gainful work" which "exists in significant numbers either in the region where such individual lives or in several regions of the country." *See* 42 U.S.C.A. § 423(d)(2)(A). In determining "the existence in the national economy of work [a claimant is] able to do, occupations are classified as unskilled, semi-skilled, and skilled." 20 C.F.R. § 404.1568. In certain cases, a claimant may have "skilled or

semi-skilled work activities [the claimant] did in past work [that] can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." *Id.* § 404.1568(d). "When the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision." SSR 82-41, 1982 WL 31389, at *7. "[T]he acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the . . . ALJ's decision." *Id.*

In this case, the ALJ found that, while DeJohnette could not perform his past work, he could perform the jobs of service dispatcher and order clerk, of which there existed 136 and 1,449 jobs in the Chicago metropolitan area, respectively. (R. 35.) These jobs, however, are classified as semi-skilled.[5] While the VE affirmed in his testimony that DeJohnette had "acquired work skills or semi-skills that could be transferred to other jobs" and that those skills were transferrable to the above-mentioned jobs, the VE never identified the skills he believed DeJohnette had acquired. (R. 63.) As the Commissioner concedes, (Def.'s Mem. at 8), the ALJ's failure to specify the skills that DeJohnette had acquired from his past work that were transferrable to these positions constitutes error. *See Key v. Sullivan*, 925 F.2d 1056, 1062 (7th Cir. 1991).

---

[5] As identified by the VE, order clerk has a specific vocational preparation (SVP) of three, and service dispatcher has an SVP of four. *See* DICTIONARY OF OCCUPATIONAL TITLES §§ 209.587-014 (listed as credit-card clerk), 959.167-010 (listed as dispatcher, service) (4th ed.1991), *available at* http://www.oalj.dol.gov/LIBDOT.htm. Positions listed in the DOT with an SVP of three or four are classified as semi-skilled. *See* SSR 00-4p, 2000 WL 1898704 at *3; 20 C.F.R. § 404.1568(b).

The Commissioner, however, is correct that this error alone would be harmless. An error in a social security determination is harmless when, considering the evidence in the record, a court "can predict with great confidence what the result on remand will be." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *see also Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (holding errors harmless where "it is predictable with great confidence that the agency will reinstate its decision on remand"). In addition to the two semi-skilled positions, the ALJ also found that DeJohnette could perform the jobs of telephone information clerk and surveillance-system monitor, both of which are unskilled positions.[6] (R. 35.) The VE also testified that there were, respectively, 223 and 1,073 jobs in the Chicago metropolitan region. *Id.* While there is no precise definition of what constitutes "significant numbers" of existing jobs, the Seventh Circuit has specified that "it appears to be well-established that 1,000 jobs [in the regional economy] is a significant number." *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009). Therefore, since there were significant unskilled jobs which DeJohnette—regardless of any transferable skills—was able to perform, the ALJ's failure to explicitly discuss which transferable skills DeJohnette possessed alone would be harmless error. *See Connour v. Massanari*, 173 F. Supp. 2d 785, 800 (N.D. Ill. 2001), *aff'd sub nom. Connour v. Barnhart*, 42 F. App'x 823 (7th Cir. 2002).

---

[6] Both telephone information clerk and surveillance-system monitor, as identified by the VE, have an SVP of 2. *See* DICTIONARY OF OCCUPATIONAL TITLES §§ 237.367-046 (telephone information clerk); 379.367-010 (surveillance-system monitor). These jobs are therefore classified as unskilled. *See* SSR 00-4p, 2000 WL 1898704 at *3; 20 C.F.R. § 404.1568(a).

## B.    DeJohnette's Other Claims

DeJohnette makes other claims—related to the ALJ's determination that DeJohnette's impairments met or equaled Listing 1.02, and his determination of DeJohnette's credibility—that he argues necessitate remand of the ALJ's decision. However, any errors on these accounts was harmless and would not themselves necessitate remand. However, as this case otherwise must be remanded, the ALJ may also want to revisit these areas on remand.

### 1.    *Step Three Analysis*

DeJohnette argues first that the ALJ erred because, in determining that the DeJohnette did not meet or equal Listing 1.02, he failed to adequately evaluate the evidence presented. *See Moore*, 743 F.3d at 1123. In this case, however, DeJohnette's claims are meritless because the ALJ explicitly addressed the evidence DeJohnette argues was ignored.

DeJohnette first contends that the ALJ failed to address consulting physician Dr. Mahesh Shah, M.D.'s opinion that DeJohnette "has a limited range of motion with flexion and in [sic] his lower extremities," and overlooked the fact that "Mr. DeJohnette testified that he had a difficult time ambulating because he could not bend his right leg at 90 degrees." (Pl.'s Mem. at 8.) But in the very portion of his opinion where he discussed Dr. Shah's "medical consultative examination," the ALJ explicitly noted Dr. Shah's findings with regard to these limitations. (R. 30-31.) DeJohnette also claims that the ALJ "failed to take in[to] account that [he] could not walk more than 50 feet without a walking cane," (Pl.'s Mem. at 8), but the ALJ explicitly noted that DeJohnette "used a cane when he walked and could not walk

50 feet without it" in his analysis of the evidence presented, (R. 30), and limited DeJohnette's RFC to work which "allows the use of an assistive device." (R. 31.)

Although presenting little legal argument on this point, DeJohnette appears to rely on *Ribaudo v. Barnhart*, 458 F.3d 580 (7th Cir. 2006) and *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003).[7] But reliance on each of these cases is misplaced. In *Ribaudo*, the Seventh Circuit found "troubling" that, "in addition to not mentioning Listing 1.04A," the ALJ "did not evaluate any of the evidence on its required criteria that [was] favorable to" the claimant. 458 F.3d at 583. This included failing to analyze the reports of two examining physicians and various other medical records. *Id.* at 583-84. And in *Brindisi*, the Seventh Circuit reversed the ALJ 's decision at step three because it found the "conclusion to be devoid of any analysis that would enable meaningful judicial review" where the ALJ failed to "mention the specific listings under which it considered [the claimant's] impairments" and because the court was "left to wonder whether the [evidence] was even considered" when the ALJ failed to mention critical evidence. 315 F.3d at 786. Here, in contrast, the ALJ explicitly addressed the evidence DeJohnette argues was overlooked as described above. This is simply not a case where the ALJ failed "to evaluate any of the evidence that potentially supported [the claimant's] claim." *Ribaudo*, 458 F.3d at 584.

---

[7] DeJohnette also mentions *Scott v. Barnhart*, 297 F.3d 589, 594 (7th Cir. 2002). But in that case, the Seventh Circuit found error because it "conclude[d] that the ALJ failed to articulate adequately the bases for his conclusions." *See id.* at 595-96. Here, DeJohnette has not argued that the ALJ failed to properly articulate his conclusions, only that he failed to adequately evaluate the evidence in doing so; accordingly, *Scott* is inapplicable to this case.

Instead, the ALJ confronted the medical evidence and his conclusion that DeJohnette's impairments did not meet or equal Listing 1.02 was supported by substantial evidence. "To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment," and the claimant bears the burden to make this showing. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Listing 1.02 is "[c]haracterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. pt 404, subpt. P, App. 1 § 1.02. As the ALJ correctly pointed out, "[t]here was no indication that the medical examiner observed deformity of any joint," and DeJohnette does not point to any medical opinion so finding. The ALJ did not err in finding that DeJohnette's impairments did not medically meet Listing 1.02.

The ALJ also did not err when he determined that DeJohnette's impairments did not equal Listing 1.02 in their severity. According to the Listings, to ambulate effectively **an individual** "must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school." 20 C.F.R. pt. 404, subpt. P, App. 1 § 1.00(B)(2)(b). The listing specifies that examples of ineffective ambulation include the inability to "walk without the use of a walker, two crutches or two canes," "walk a block at a reasonable pace on rough or uneven surfaces," "use standard public transportation,"

"carry out routine ambulatory activities, such as shopping and banking," or "climb a few steps at a reasonable pace with the use of a single hand rail." *Id.*

In his analysis, the ALJ noted that DeJohnette had testified that he did not perform household chores, but did so based on his anticipation that "he would drop objects if he tried to lift them. Anticipation of difficulty performing tasks is not the same as inability to perform tasks." (R. 32.) He also cited to Dr. Appelbaum's notes, in which the doctor noted that DeJohnette reported being "independent in all his activities of daily living and mobility." (R. 32, 250.) The ALJ also noted that DeJohnette had testified that he was able to walk one block "if he wore his air boot." (R. 32.) DeJohnette also testified that he was able to climb "probably five" stairs without any problems, (R. 49), and that he regularly climbed six or seven steps to get to the first to get into his apartment. (R. 50.) And while DeJohnette necessitated the use of one cane while walking, that does not itself equal the requirements of the listing. *See Walker v. Astrue*, No. CIV. 11-107-JPG-CJP, 2011 WL 6122555, at *7 (S.D. Ill. Aug. 19, 2011) report and recommendation adopted, No. 3:11-00107-JPG, 2011 WL 6122553 (S.D. Ill. Dec. 8, 2011) (finding "[t]he use of one cane does not limit the functioning of both upper extremities" under the Listings).

It is true that the ALJ discussed some of the relevant medical evidence in the section of his opinion discussing DeJohnette's RFC, rather than in the portion discussing the step three analysis specifically. But "[b]ecause it is proper to read the ALJ's decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five," a

reviewing court "consider[s] the ALJ's treatment of the record evidence in support of both his conclusions at steps three and five." *Rice v. Barnhart*, 384 F.3d 363, 370 n.5. (7th Cir. 2004); *see also Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (stating that a reviewing Court "read[s] the ALJ's decision as a whole and with common sense."). In this respect, "blending the step-three and RFC analysis is not fatal in itself," because the ALJ built "a logical bridge between the evidence and each conclusion." *Catchings v. Astrue*, 769 F. Supp. 2d 1137, 1144 (N.D. Ill. 2011). Here, while the ALJ's determination could have been better-articulated, it was supported by substantial evidence and therefore was not erroneous. *See Jacobson v. Astrue*, No. 08 C 50173, 2010 WL 1539871, at *9 (N.D. Ill. Apr. 16, 2010) (affirming finding that claimant did not meet Listing 1.02 where claimant could "ambulate at least one block, and [did] not use hand-held assistive devices that limit the functioning of both upper extremities" and there was "also evidence that he can travel alone, and that he participates in grocery shopping").

DeJohnette also argues that the ALJ erred by failing to adequately address the effects of his obesity at step three. An ALJ must consider the effects of obesity in determining whether a claimant's impairments meet or equal a listing. *See* SSR 02-1p, 2002 WL 34686281, at *3. Under the ruling, "the ALJ must specifically address the effect of obesity on a claimant's limitations." *Villano*, 556 F.3d at 562. Obesity can, alone or in combination with other impairments, medically equal a listing, resulting in a finding of disability. *See* SSR 02-1p, 2002 WL 34686281. Where obesity renders a claimant unable to ambulate effectively, that claimant's

impairments may be equivalent to Listing 1.02. *See* 20 C.F.R. pt 404, subpt. P, App. 1, § 1.00(B)(2)(a); *Mueller v. Astrue*, 860 F. Supp. 2d 615, 637 (N.D. Ill. 2012), *aff'd sub nom. Mueller v. Colvin*, 524 F. App'x 282 (7th Cir. 2013).

In this case, the ALJ noted that he found DeJohnette's extreme obesity to be a severe impairment, and stated that "its effects have been considered in connection with the claimant's other conditions." (R. 29.) However, the ALJ did not explicitly discuss DeJohnette's obesity further in the opinion. In a past case, the Seventh Circuit has found reversible error where an ALJ "mentioned in passing that [a claimant's obesity was] a severe impairment but did not consider its significance in relation to" that claimant's knee problem. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). In DeJohnette's case, the ALJ did no more than this in his opinion; considered by themselves, then, ALJ's comments were not enough to adequately assess the effects of DeJohnette's extreme obesity at step three.

However, an ALJ's failure to explicitly discuss the effects of obesity may be harmless error where remand for explicit consideration would not affect the outcome of the case. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Where an ALJ implicitly considers the effects of obesity by adopting the opinion of doctors who were aware of the condition and where the claimant also fails to specify how obesity results in impairments in ways not considered by the ALJ, the error is harmless. *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Skarbek*, 390 F.3d at 504. In rendering his decision at step three in this case, the ALJ relied on the report of Dr. Mahesh Shah, the consulting physician who examined

DeJohnette. (R. 260 et seq.). Shah's opinion, in turn, mentioned DeJohnette's obesity, (R. 261), but othwersise made no reference as to its effect on his condition. Such an omission "is not likely to have occurred if [the doctor] thought the obesity affected or exacerbated a medical issue." *Mueller*, 860 F. Supp. at 638. And DeJohnette has made no argument to the ALJ or to this court as to how his obesity exacerbated his condition and should have led to a finding of disability in ways not considered by the ALJ. *See Orienti v. Astrue*, 958 F. Supp. 2d 961, 983 (N.D. Ill. 2013) ("[A]ny error in failing to mention obesity is harmless if the claimant did not explain to the ALJ how her obesity aggravated her condition and rendered her disabled.").

DeJohnette relies on *Martinez*, 630 F.3d at 698 and *Robinson v. Astrue*, 667 F. Supp. 2d 834, 847 (N.D. Ill. 2009), but these cases are distinguishable. In *Martinez*, the claimant was extremely obese and a treating physician had noted the claimant's obesity as exacerbating her knee problem, which itself was " 'well beyond' minimally invasive surgery and 'heading for' knee replacement." 630 F.3d at 698. In his opinion, however, "[t]he administrative law judge mentioned in passing that [the claimant's obesity was] a severe impairment but did not consider its significance in relation to [the claimant's] knee," rejecting the opinions of treating physicians who had done so and instead relying on the opinions of non-treating physicians to find otherwise. *Id.* In this case, in contrast, the ALJ in fact *relied on* the medical reports of record in reaching his conclusion, and—as described above—DeJohnette's contentions that the ALJ overlooked such evidence are unavailing. In *Robinson*, the

ALJ erred by "mention[ing] SSR 02–1p's requirements at [the claimant's] hearing," but failing to mention obesity or the Ruling in the opinion. *See* 667 F. Supp. 2d at 847-48. In DeJohnette's case, in contrast, the ALJ—while not discussing obesity specifically in relation to DeJohnette's claimed impairments—noted that he found obesity to be a severe impairment and stated that he considered it in his analysis, and also discussed the medical evaluations which took that obesity into account.

Although it certainly could have been more comprehensive, any error on the ALJ's part in failing to further discuss the effects of DeJohnette's obesity at step three of the analysis was harmless. However, given that remand is otherwise appropriate in this case, the ALJ may wish to make his findings with respect to DeJohnette's obesity more explicit.

### 2. *DeJohnette's Credibility*

DeJohnette also argues that the ALJ erred in determining his credibility. As part of considering a claimant's residual functional capacity, an ALJ must determine the impact of a claimant's symptoms, including pain. *See* 20 C.F.R. § 404.1529(d)(4). Because those symptoms "sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," an ALJ "must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence." SSR 96-7p, 1996 WL 374186, at *1.

DeJohnette argues first that the ALJ "failed to consider important findings of the consultative examiner in assessing Mr. DeJohnette's credibility." (Pl.'s Mem. at 10.) However, similarly with respect to his arguments at step three of the ALJ's analysis, much of the evidence that DeJohnette argues was overlooked by the ALJ was in fact specifically considered. DeJohnette argues that the ALJ overlooked medical evidence relating to his use of a cane, range of motion in his lumbar spine and right knee, problems with his legs, and evidence of his degenerative disk disease. (Pl.'s Mem. at 11; R. 260-63, 265.) But the ALJ specifically addressed all of this evidence in his decision. (R. 31, 33.) And, again, although some of the discussion of this evidence took place before the paragraphs discussing the RFC determination specifically, as discussed above "it is proper to read the ALJ's decision as a whole" and "would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five." *Rice*, 384 F.3d at 370 n.5. DeJohnette also argues that ALJ overlooked Dr. Appelbaum's statement in treatment notes that DeJohnette "continued to have pain in his left knee, right shoulder, back, right ankle, and bilateral lower extremities." (Pl.'s Mem. at 11; R. 242.). But the ALJ in fact made explicit reference to these notes, in which DeJohnette related his subjective complaints about the pain he experienced. (R. 32.) The ALJ simply did not overlook evidence in reaching his credibility determination.

DeJohnette also argues that the ALJ erred by "not mak[ing] it sufficiently clear in his decision the weight given to Mr. DeJohnette's statements regarding pain" and by "not providing specific explanations as to why he disbelieved Mr.

DeJohnette's statements about his severe pain." (Pl.'s Mem. at 11.) In making a credibility finding, an ALJ must give specific reasons for discrediting a claimant's testimony which are "supported by record evidence and . . . [are] 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.' " *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001)); *see* SSR 96-7p, 1996 WL 374186, at *2. Where the ALJ's opinion does so, however, it will be upheld by a reviewing court unless it is "patently wrong." *See Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007).

Here, despite errors, the ALJ adequately supported his credibility finding. The ALJ specifically noted that DeJohnette had not been taking medication for pain relief, which is a proper consideration under the regulations. *See* SSR 96-7p, 1996 WL 374186, at *3. When holding a failure to take medication against a claimant, an ALJ must determine whether a claimant has a "good reason" for failing to do so. *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). Here, while DeJohnette testified that he stopped taking pain medication because it made him nauseous, the ALJ correctly noted DeJohnette had reported to Dr. Applebaum that he "does not feel [the] need for analgesics and does not want any." (R. 250.) This contradiction was appropriately considered by the ALJ in discounting DeJohnette's credibility. *See* SSR 96–7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other

information in the case record."). The ALJ also noted that, although referred for physical therapy, DeJohnette had not pursued such treatment, and DeJohnette did not offer any explanation for failing to pursue such treatment. These findings support the ALJ's credibility determination. *See Schmidt*, 496 F.3d at 844 (affirming credibility in part because claimant's "medical history indicate[d] that she voluntarily discontinued physical therapy and declined to pursue pain management, both of which cast doubt on the severity of [her] pain and her need to alleviate it."). In light of the ALJ's analysis, the court cannot say that his determination was "patently wrong."

DeJohnette also argues that the ALJ failed to properly analyze his activities of daily living by finding that—although DeJohnette testified that he did not perform household tasks—there was no indication that he was unable to do so. In support of this claim, DeJohnette points to his mother's third party function report in which she stated that DeJohnette "does not cook," (R. 174), and his own self-completed function report in which he checked "no" next to the question "Do you prepare your own meals"? (R. 185; Pl.'s Mem. at 12.) "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c)). Neither of these pieces of evidence stated that DeJohnette was unable to prepare his own meals, only that he did not. The ALJ therefore did not err by finding that DeJohnette had failed to establish that he was unable to prepare his own meals.

DeJohnette is correct, however, that the ALJ erred when he found that DeJohnette had testified that he could walk "four blocks," found this finding to be contrary to DeJohnette's other testimony, and found that this discrepancy negatively affected DeJohnette's credibility. (R. 32-33.) As the Commissioner concedes, (Def.'s Mem. at 4), DeJohnette testified that the store was in fact four doors—and not four blocks—away from his home. (R. 51.) On remand, the ALJ should clarify the effect, if any, of this correction on his ultimate findings.

## CONCLUSION

For the foregoing reasons, Plaintiff DeJohnette's Motion to Reverse the Decision of the Commissioner of Social Security is GRANTED IN PART and DENIED IN PART, and the Commissioner's cross-motion for summary judgment [Doc. No. 34] is DENIED. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this Order.

**SO ORDERED.**                                    **ENTERED:**

**DATE:      December 23, 2015**              _____
                                               **HON. MARIA VALDEZ**
                                               **United States Magistrate Judge**